# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

NEW MEXICO STEEL CO., INC.
a New Mexico corporation,

        Plaintiff,

vs.                                                   CIV. No. 97-1169 BB/DJS

PURITAN-BENNETT CORP.
a Delaware corporation,

        Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court for consideration of Plaintiff's May 28, 1999 motion for partial summary judgment (Doc. 47), and Defendant's June 8, 1999 motion for partial summary judgment (Doc. 51). The Court has reviewed the parties' submissions and the relevant law and, for the reasons set forth below, determines that both motions should be denied. In addition, before a jury is selected in this case it will be necessary to hold an evidentiary hearing to determine whether part or all of the case must be submitted to arbitration as provided in the parties' purchase agreement. Therefore, such a hearing will be scheduled for a date prior to September 13, 1999, the date now set for jury selection in this case.

**Facts**

Plaintiff entered into a contract to sell its business (supplying gases, tools, equipment, and supplies for medical purposes) and most of the business assets to Defendant. The purchase agreement states that, as consideration for the assets being purchased, Defendant would deliver to Plaintiff consideration totaling $1,212,618. This amount was comprised of various payments for

various assets, such as $503,018 for gas cylinders, $73,000 for trucks and equipment, and $217,000 for goodwill and customer lists. With respect to some of the assets, the consideration being paid represented only a percentage of the total value of the assets as of the closing date. For example, the $503,018 for the gas cylinders was 85% of the amount set out in Exhibit A to the purchase agreement, purporting to establish the full value of the gas cylinders owned by Plaintiff at the time of closing. As another example, the $104,000 to be paid for Plaintiff's accounts receivable represented only 50% of the amount established in Exhibit A as the value of the accounts receivable owed to Plaintiff at the time of closing.

The purchase agreement did not limit the ultimate purchase price to the $1,212,618 paid at the time of closing. Instead, with respect to each of the assets for which a percentage less than the full Exhibit A value was paid, the purchase agreement provided for a possible price adjustment. These price adjustments were dependent on schedules Defendant was required to prepare and submit to Plaintiff, within a designated time following the closing. Again, a few examples are illustrative. Within 150 days of the closing, Defendant was required to deliver to Plaintiff a schedule indicating the number of gas cylinders Defendant had been able to account for as of 120 days after the closing. The $503,000 paid for the gas cylinders would then be subject to adjustment, either up or down, depending on the number of cylinders Defendant had found. The purchase agreement also contemplated that Defendant would collect accounts receivable owed to Plaintiff and prepare a schedule indicating the aggregate amount Defendant had been able to collect as of ninety days from the closing date. This schedule was required to be submitted to Plaintiff within 120 days after the closing, and the amount paid for the accounts receivable would be subject to adjustment (again, either up or down) at that time. Similar provisions were provided

in the purchase agreement for the inventory and office equipment asset categories.

Significantly, according to the purchase agreement any unresolved disputes concerning the schedules delivered by Defendant were to be submitted to a "mutually acceptable" nationally recognized accounting firm for binding arbitration. Also significantly, Defendant failed to deliver any of the four required schedules within the time periods set out in the purchase agreement. Defendant finally delivered the schedules, after delays that stretched into months, doing so only after Plaintiff filed this lawsuit for breach of contract. Defendant then asked this Court to order the parties to submit to the arbitration process described in the purchase agreement. Plaintiff responded by arguing Defendant had waived its right to impose arbitration as a remedy, due to its failure to deliver the schedules in a timely manner. This Court determined the purchase agreement is ambiguous concerning the effect on the arbitration provisions, should Defendant fail to meet the deadlines established by the purchase agreement. Therefore, this Court declined to order the parties to submit to arbitration, but allowed the parties an opportunity to develop facts concerning the issue. Almost ten months later, Plaintiff filed its motion for partial summary judgment, and Defendant responded with its own motion.

**Standard of Review**

"Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." Id. On a motion for summary

3

judgment, the issue is "not whether [the court] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). "Nevertheless, a jury question does not exist because of the presence of a mere scintilla of evidence; rather, there must be a conflict in substantial evidence to create a jury question." Walker v. NationsBank of Florida, 53 F.3d 1548, 1555 (11th Cir. 1995). The Court will consider the parties' motions for summary judgment in light of these standards.

**Plaintiff's Motion**

Plaintiff's motion for partial summary judgment has two main components. First, Plaintiff maintains it is entitled to a judgment as a matter of law establishing that Defendant breached the purchase agreement and owes $423,268 more than the amount paid at the time of closing. Second, Plaintiff again contends Defendant waived the arbitration provisions of the purchase agreement by failing to comply with the deadlines for delivering the various schedules concerning the various assets.

**Amount of Purchase Price/Remedy for Breach:** With respect to the first argument, the Court finds Plaintiff's interpretation of the purchase agreement contrary to the language of the agreement itself and dependent on extrinsic evidence that may or may not exist. Therefore, the Court will deny Plaintiff's motion for summary judgment requesting a breach-of-contract judgment in the amount of $423,268. Plaintiff's position relies on the existence of Exhibit A to the purchase agreement. In Exhibit A, the parties listed a number of specific assets, such as gas cylinders; a quantity and price for each asset unit; and a total value for the assets. This total value was listed as $1,635,886. According to Plaintiff, this figure was the total purchase price, and

4

Defendant was only entitled to a reduction in that purchase price by complying with the schedule-delivery requirements of the purchase agreement. Since Defendant did not do so, maintains Plaintiff, Defendant is obligated to pay the full value of all the assets, or $1,635,886.

The main problem with Plaintiff's position is that there is no language in the purchase agreement to support it. The agreement provides that, as consideration for the assets being purchased by Defendant, Defendant would deliver $1,212,618 to Plaintiff as the "Purchase Price" (not as a "down payment" on the purchase price or a "partial payment" of the purchase price). The agreement also provides for adjustments to this purchase price, through the schedule-delivery process described above. Nowhere does the agreement state that Plaintiff's claimed figure of $1,635,886 is the agreed-upon purchase price for the business and its assets. Nowhere does the agreement contain any language obligating Defendant to pay the full value of the assets, should Defendant breach any provision of the contract. Nor is there a liquidated damages clause in the agreement.

The only language in the agreement concerning the purchase price for the business is the language in Section 2, calling for payment of $1,212,618 with the potential for subsequent adjustments to that price. According to this language, Defendant agreed to pay 100% of the value of some of the assets, 85% of the value of another, and 50% of the value of the rest, with the possibility of an upward or downward adjustment after delivery of the required schedules. The mere fact that Defendant did not pay 100% of the value of all the assets, however, cannot be transmuted into an agreement by Defendant to pay the full value of the assets should Defendant breach the contract. Such a remedy, if it is to exist, must be reflected in the language of the contract or, possibly, in extrinsic evidence that has not yet been presented to this Court.

5

Strongly supporting this Court's interpretation of the agreement is the fact that the agreement does specify what is to happen if Defendant fails to account for, and pay for, the assets that were supposed to be scheduled. Any unscheduled assets are to remain the property of Plaintiff. For example, any accounts receivable not collected as of 120 days from the closing date, and not paid for by Defendant through the schedule-delivery process, are to remain Plaintiff's property. *See* Purchase Agreement, § 2.2(b), last sentence. Presumably Plaintiff would then assume the risk of attempting to collect the unpaid account. Similarly, any gas cylinders or office equipment not accounted and paid for by Defendant are also to remain Plaintiff's property. § 2.2(a) and (d). Finally, any inventory not sold within six months of the closing date would revert to Plaintiff. § 2.2(c). The existence of this specific remedy for omissions in the schedules undercuts Plaintiff's argument that the real remedy for a schedule-delivery breach is compensation for the full value of the assets as listed in Exhibit A.

The Court's interpretation is reinforced by the circumstances of this case, at least as evidenced by the language of the purchase agreement.[1] It is obvious the parties were uncertain as to how many of the accounts receivable could actually be collected, and set a time limit on how long Defendant would have to attempt to collect them. Following that time period, any uncollected accounts would belong to Plaintiff. The same is true of the gas cylinders and office equipment – the parties were uncertain how many gas cylinders and how many pieces of office equipment were actually owned by Plaintiff, and allowed Defendant a certain amount of time to

---

[1] Plaintiff maintains there is no evidence available concerning the parties' intentions with respect to the schedules, as there was no discussion concerning those schedules during negotiation of the purchase agreement. At this point, therefore, the language of the agreement is the only source the Court has available for discerning the parties' intentions.

attempt to account for all these items of property. Again, any unscheduled items of property would remain Plaintiff's. Finally, the parties were uncertain how much of the inventory would be sold within six months of the closing date, and decided to use that date as the bench mark for making adjustments to the purchase price, with any remaining inventory reverting to Plaintiff's ownership. Given the uncertainties facing the parties, it is unlikely they would have agreed that the total purchase price was actually the full assumed value of the assets, even if that assumed value should turn out to be wrong once the accounts receivable were actually collected, the inventory actually sold, and the remaining gas cylinders and office equipment actually counted and itemized.[2]

The Court's disagreement with Plaintiff's interpretation of the agreement may be put succinctly as follows. Plaintiff construes the agreement as a contract to purchase its business for $1,635,886, with the possibility that Defendant could reduce that purchase price by delivering timely schedules. Plaintiff also construes the agreement to provide a remedy for breach of the schedule-delivery provisions that is not stated any place in the agreement -- payment of the full assumed asset values contained in Exhibit A. The Court, on the other hand, interprets the agreement as a contract to purchase the business for $1,212,618, with the possibility that either Plaintiff could receive an increase in compensation or Defendant could receive a rebate of a portion of the purchase price, following delivery of the schedules and resolution of any conflicts

---

[2]It is highly likely Plaintiff would have agreed to such a contract, because it would have placed all the risk of the assumed values being wrong on Defendant, but highly unlikely Defendant would have done so, for the same reason.

regarding those schedules.[3] In addition, the Court construes the agreement to expressly provide a remedy for breach of the schedule-delivery provisions, a remedy different than payment of the full asset values listed in Exhibit A.

Given the above discussion, the Court has considered the possibility of not only denying Plaintiff's motion for summary judgment, but of granting summary judgment for Defendant on the issue of whether $1,635,886 was either the true purchase price or the proper remedy for a breach of the schedule-delivery provisions of the purchase agreement.[4] However, Defendant has not moved for summary judgment on this issue. Furthermore, the existence of Exhibit A and its reference to price allocation may raise a factual dispute concerning the true total purchase price agreed upon by the parties, which might be clarified by resort to extrinsic evidence. As noted in the Court's previous opinion, in New Mexico extrinsic evidence is admissible in contract cases not only to clarify ambiguities in a contract, but to show that an ambiguity actually exists. See, e.g., Mark V, Inc. v. Mellekas, 114 N.M. 778, 781-82, 845 P.2d 1232, 1235-36 (1993). Therefore,

---

[3]The Court recognizes that the last page of Exhibit 1 is headlined "PRICE ALLOCATION", seemingly indicating the 100% asset values constitute the total price to be paid for the business. However, the Court also notes that Section 2.3 of the purchase agreement refers to the preparation of a schedule for tax purposes, allocating the purchase price to various assets. That appears to be the true purpose of Exhibit 1, especially since (as discussed above) there is no language in the purchase agreement obligating Defendant to pay the full asset values listed in the exhibit.

[4]With all due respect to Professor Murray's legal opinions, they do not raise an issue of fact concerning the meaning of the purchase agreement. They are simply legal conclusions that are not admissible as evidence. In addition, they appear to be based on a rather cursory review of the purchase agreement. For example, the supplemental affidavit and opinion letter attached to Plaintiff's reply brief opines that the purchase price for the business was the total value of the assets listed in Section 2.1 of the contract. This conclusion, however, is not supported by reference to any provision of the purchase agreement establishing that total asset value as the purchase price. As discussed above, there is no such language in the agreement.

the Court will simply deny Plaintiff's motion for summary judgment at this time, insofar as it seeks to establish that $423,268 is now owing, as a matter of undisputed fact.

**Waiver of Arbitration:** Plaintiff maintains that Defendant has waived the right to submit any disputes about the schedules and purchase-price adjustments to an arbitrator, by failing to comply with the time deadlines contained in the contract. Defendant admittedly did not submit the schedules concerning gas cylinders, inventory, accounts receivable, or office equipment within the time periods required by the contract. According to Plaintiff, compliance with those time requirements was a condition precedent to Defendant's right to obtain any adjustment to the purchase price, or to avail itself of the arbitration process.

If submission of the schedules and the resulting price adjustments had been intended solely for Defendant's benefit, the Court would have less difficulty agreeing with Plaintiff's position. *See Davis v. Dawson*, 15 F.Supp.2d 64, 117-119 (D.Mass. 1998) (where purchase price adjustment was intended for buyer's benefit, and obtaining audit within 60 days was condition precedent to such an adjustment, and contract contained a "time is of the essence" clause, buyer's failure to ensure performance of the audit within the 60 days constituted a waiver of the purchase price adjustment mechanism contained in the contract). In this case, however, the schedule-delivery provisions of the purchase agreement could have ended up being for either Plaintiff's benefit or Defendant's benefit, depending on the contents of the schedules. If Defendant collected more accounts receivable, within the allotted time, than the 50% it paid for at the time of closing, for example, Plaintiff would be paid more for those accounts. Therefore, when the purchase agreement was signed it appeared to be just as much to Plaintiff's benefit as to Defendant's to have the schedules submitted. Under those circumstances, it is less likely the parties intended that

9

late submission of the schedules would entirely eliminate the purchase-price adjustment process, which included the arbitration provision.[5]

Other factual circumstances in this case make it unclear, despite Plaintiff's arguments to the contrary, that summary judgment on the arbitration-waiver issue is appropriate at this time. For example, Mr. Tim Downing ("Downing"), Plaintiff's former president and a shareholder, became an employee of Defendant following the purchase. There is evidence Downing was aware of the looming delay in preparing the schedules as early as February 1997, before any of the deadlines for delivering schedules had run. It is not clear whether Downing, on behalf of Plaintiff, may have waived strict performance of the schedule-delivery provisions of the purchase agreement. It is also not clear whether Plaintiff may have had some business reason to insist upon strict adherence to the time deadlines in the purchase agreement, and did so insist. Finally, the present record is also deficient with respect to the causes of the long delays in preparation of the schedules.

It is apparent to the Court that at this time, no decision can be made as to whether the arbitration provisions of the purchase agreement should be enforced or whether those provisions have been waived by Defendant's untimely submission of the schedules. The Court will therefore schedule an evidentiary hearing for a date prior to jury-selection, to resolve the arbitration question. At this hearing the parties must be prepared to present evidence concerning the circumstances surrounding the negotiation of the purchase agreement, including the reasons the

---

[5]Of course, even if the late submission of the schedules does not constitute a waiver of the arbitration provisions or the purchase-price adjustments, such late submission, if unexcused, was still a breach of the purchase agreement. This breach entitles Plaintiff to any damages flowing from the long delay in delivering the schedules.

schedule-delivery provisions were included in the agreement rather than a simple one-time payment of a single purchase price.  The parties must also be prepared to present evidence as to the causes of the long delays in preparation of the schedules, any reasons why time might have been of the essence in delivering the schedules, and any possible waivers of the strict deadlines established by the purchase agreement.  As the parties are aware, the Court's central duty in a commercial contracts case is to determine the intent of the parties and to reach a result that comports with that intent.  Any evidence the parties may have concerning the intent of the parties, with respect to the arbitration and schedule-delivery provisions of the purchase agreement, will be helpful to the Court in making the decisions needed in this case.

**Defendant's Motion**

Defendant's motion is completely without merit and can be dispensed with quickly.  Defendant maintains the undisputed facts show the schedules were delivered to Plaintiff, albeit very late.  Defendant also maintains Plaintiff never served a notice of dispute contesting the schedules, and is therefore bound by the schedules.  Since the schedules show Defendant overpaid Plaintiff for the assets actually existing at the time of closing, Defendant requests a determination from this Court that it is entitled to a rebate of some $130,000 of the purchase price already paid.  The Court is at somewhat of a loss to understand how Defendant can even make this argument, since the record contains a clear notice of dispute mailed and faxed to Defendant's counsel, on October 8, 1997, well within the thirty days allowed by the purchase agreement.  Apparently Defendant's argument is this notice of dispute is somehow deficient because it accompanied a copy of the amended complaint filed in this case.  If that is Defendant's position, it is totally without merit.  The October 8 letter written by Plaintiff's counsel clearly states the complaint

11

accompanying the letter should be considered a notice of dispute of the schedules, if a court should determine the price-adjustment provisions of the purchase agreement remained in effect. The Court sees no reason to invalidate the notice of dispute simply because Plaintiff chose to cover all its bases by both filing a lawsuit and serving its notice of dispute.

Defendant also appears to request partial summary judgment on Plaintiff's claim of a breach of the covenant of good faith and fair dealing. This request is based on Defendant's assertion there is no evidence of such a breach. Defendant, however, submitted no affidavits testifying to the adequacy of its attempts to collect the outstanding accounts receivable or to sell the inventory. In addition, there has been no evidence presented concerning the reasons for the long delays in what were apparently simple processes such as locating the office equipment or determining whether gas cylinders exist. It was incumbent on Defendant to present a *prima facie* showing of entitlement to summary judgment, by producing facts showing it acted in good faith and treated Plaintiff fairly. In the absence of such evidence, there is no basis for summary judgment. In other words, Defendant cannot simply point to a lack of evidence supporting Plaintiff's claim, when Plaintiff has not yet been put to its proof on that claim and has had no reason to submit any evidence it may have concerning Defendant's lack of good faith. Defendant's motion for summary judgment will be denied.

**Conclusion**

The only material fact that appears to be undisputed in this case is the fact that Defendant delivered very late schedules purporting to show what assets actually belonged to Plaintiff at the time of closing. The parties dispute all other aspects of this case, including the consequences that should flow from Defendant's late delivery, the purchase price agreed to by the parties, whether

Defendant acted in good faith in preparing the schedules or performed in slip-shod fashion, and whether the disputes arising out of this transaction should be submitted to arbitration or resolved in this Court. Furthermore, the purchase agreement is ambiguous as to many of these issues and further factual development is necessary to resolve them. For these reasons, the motions for summary judgment filed by both Plaintiff and Defendant will be denied.

**ORDER**

Based on the foregoing, Plaintiff's motion for partial summary judgment (Doc. 47) is hereby DENIED, and Defendant's motion for partial summary judgment (Doc. 51) is hereby DENIED.

DATED August 6th, 1999.

_____
BRUCE D. BLACK
UNITED STATES DISTRICT JUDGE


**Attorneys:**

**For Plaintiff**
Kenneth R. Wagner
Kenneth R. Wagner & Associates, P.A.
P.O. Box 25167
Albuquerque, New Mexico 87125-5167

**For Defendant**
Gerald G. Dixon
Julie E. Chicoine
Hatch, Allen & Shepherd, P.A.
P.O. Box 30488
Albuquerque, New Mexico 87190-0488